## LOWELL TACKETT V. THE STATE.

No. 20286.   Delivered May 3, 1939.
Rehearing Denied June 7, 1939.

The opinion states the case.

*Stephens & Sams,* of Benjamin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is assault with intent to rape; the punishment, confinement in the penitentiary for 15 years.

Prosecutrix, Willie Walker, testified that she had known appellant about a month and a half at the time of the assault, which occurred near a dance on the 15th of January, 1938. We quote from her testimony, as follows: "So we walked down the road coming from the dance. * * * That was just me and Lowell Tackett (appellant) that were walking down there, so we crossed the bridge, and we got down—I don't know how far—and he got my arm here and tried to force me over a barbed-wire fence. I caught hold of the wire and cut my finger. I told him I had cut my finger, so he let me loose. He told me why he was trying to push me over the fence. He told me that he intended to have an intercourse. I told him he was crazy, I wasn't that kind of a person. * * * As we got to the bridge, he caught my shoulder and pushed me off and broke my arm. The bridge, as I say, is down in a ditch, and it comes off along here, and we were right down at the end of the ditch something like that. * * * He dragged me back under the bridge and started twisting my right arm, and started to twist my left one. I told him not to twist it because it had been broken. All of this time I was fighting him and biting his wrist. He said: 'If there is blood shed over this, you will pay for every bit of it.' He had this arm (indicating) and twisting down all the time. When he dragged me under the bridge, he said what he was going to do to me. He said: 'You can just get that stuff out of your head about not being that kind of a person, and come on and let me have it.' I begged him to stop. When he started twisting, I thought I would tell him that it had been broke, but it was as well and strong as the other one. He kept on twisting it. He kept his hand over my mouth so I couldn't holler, and when I got his hand off one time, and I did holler, he hit me over the head with his fist. He doubled up his fist. It was not more than a half a dozen times that he hit me, but when he was hitting me he was saying, 'If you don't hush, I am going to beat you to death.' I can't remember what he said because he was just about to kill me as he was twisting my arm. One time there was a car went over the bridge, and I screamed when it went over, but they did not hear me and went on. So he twisted my arm again, and I screamed again and he hit me three times. He said, 'If you don't hush, I am going to kill you.' I said, 'I had rather you would—I had rather be dead than to bear this.' He said, 'I have got a knife in my pocket, and I will kill you with that.' He bent

me over and when he finally let me loose he put my step-ins in his pocket. That's the last time I saw them. And then he said something. He said, 'Are you going to let me have it?' I said, 'No.' He kept on twisting my arm and it broke. I said, 'Lowell, you have got to get me to a doctor.' He let me loose, and he kicked me as he let me go. We started back to the dance, and I walked ahead of him. But he got ahead of me several times going back to the dance. I sat down by the side of the road and I was just about to pass out. As we passed over the bridge Lowell said, 'What are you going to tell them?' I said, 'I don't know.' He said, 'You can tell them you fell off the bridge.' I said, 'All right.' He said, 'Be sure that you do.' After we left the bridge there was a car passed me. I tried to stop the car and it didn't stop. So I sat down on the side of the car after I got there (referring to the dance hall) and asked him if he would go in and tell Iva May, tell her I had broke my arm. So he did."

Relative to her position at the time appellant was endeavoring to have intercourse with her, prosecutrix testified: "As to the position of my limbs—I was lying on my back, I kept my legs crossed all the time. He tried to force my legs apart and he couldn't. Each time he would put his hand away from my mouth I would scream. He put his hand on my private part twice. He had his private part out because my skirts were up and they touched my legs twice. He told me that he was going to have intercourse with me. He told me, 'You are going to let me have it or I will never let you loose.' I said, 'I will not.' He said, 'I will never let you loose if you don't. I will show you.' And he twisted my arm." On cross-examination prosecutrix testified that she told everyone with whom she came in contact after the assault that she had fallen off of a bridge and broken her arm. Also she testified that appellant came to her home on three occasions after the assault. She said, "I talked to him just as small an amount as I could. Only when he would ask me a question I would answer it." In connection with her testimony that she had refrained from reporting the assault, she said, "I was afraid my father would kill that boy if I told my father what he done. I was not afraid of this boy but I didn't want my father to have blood on his hands."

After appellant notified Iva May that prosecutrix had broken her arm he accompanied them to the hospital, where the doctor gave prosecutrix two hypodermics and advised her he wanted her father to be present when he set her arm. Again, we quote from the testimony of prosecutrix: "Lowell (appel-

lant) begged him not to have daddy." The doctor replied that it was necessary to have him, as prosecutrix was too weak to take an anaesthetic. When her father reached the hospital the prosecutrix told him that she had fallen off of a bridge and broken her arm. After her arm had been set she was taken to her father's home the following morning.

One of the attending physicians testified that appellant appeared to be excited when he came to the hospital with prosecutrix. We quote from the testimony of the doctor: "When I said that the girl's parents would have to be notified before I would give the anaesthetic, the defendant immediately asked if that would be necessary to fix this arm."

Testifying in his own behalf, appellant denied that he had assaulted the prosecutrix. It was his version that she accidentally fell off of the bridge and broke her arm.

Appellant earnestly insists that the evidence is insufficient to support the conviction, his main contention being that the failure of the prosecutrix to report the alleged outrage was a circumstance discrediting her testimony to the extent that the conviction should not be permitted to stand. It has been already observed that prosecutrix testified that she failed to report the matter because she was afraid her father would kill the appellant, and that she did not want her father to have blood on his hands. We do not feel we would be warranted in saying, as a matter of law, that the reason advanced by prosecutrix for her silence was insufficient. In this connection, we are not to be understood as holding that in cases of assault with intent to rape by force the rule with reference to the failure to make complaint should be given the same application as is made of it in cases of rape by force. We leave that question undecided. From what we have said it follows that we deem the evidence sufficient to support the conviction.

Appellant has a bill of exception in which complaint is made of the argument of the district attorney. We quote the argument: "This sex-fiend, who has admitted that he now stands convicted in Knox County of assault with intent to commit rape and who now is under indictment for two other cases of assault with intent to commit rape upon two Jones County girls; who is now under bond and who admits if he hadn't have made bond that I would have had to have sent to the penitentiary to have got him to try him before you." It appears from the bill one of appellant's counsel objected to the argument and that the court promptly sustained the objection and instructed the jury not to consider the remarks

of the district attorney. Again, it is shown in the bill that the district attorney again referred to appellant as a sex-fiend, and that the court again sustained the objection and instructed the jury not to consider such remark. The court qualifies the bill as follows:

"That when the district attorney referred to the defendant as a sex-fiend he was asking the jury whether they could believe the story of the defendant that the witness, Willie Walker, simply fell off a bridge backwards, the district attorney saying: 'Can you believe this sex-fiend, who has admitted that he now stands convicted in Knox County of assault with intent to commit rape, and who is now under indictment for two other cases of assault with intent to commit rape, etc.,' whereupon counsel for the defendant objected to the use by the district attorney of the expression 'sex-fiend' and the reference to former conviction and pending indictments in that the district attorney was using same for another and different purpose than that for which it was admitted in evidence, to wit, being to affect the credibility of the witness. The court instructed the jury not to consider said argument of the district attorney, whereupon the district attorney stated to the jury that it was true and correct that the court's charge limited the jury's consideration of the testimony of the defendant that he had been convicted of a felony and had been indicted for other felonies only as tending to impeach the credibility of the defendant as a witness and that the jury could not consider said testimony for any other purpose, but that this did not preclude the State from making a reasonable deduction from all the facts in the case and that from all the facts in the case, the State did make the deduction that the defendant was a sex-fiend and that same was a reasonable deduction in the light of the facts adduced in evidence in the instant case.

"And with the further qualification that the court does not remember the exact language used by the district attorney in reference to the defendant, and does not state whether counsel for the State or defense, quoted the exact language used by the district attorney, but the court does remember that the district atorney, in his argument, twice referred to the defendant as a 'sex-fiend,' and the court, in each instance, instructed the jury not to consider said argument and reference for any purpose."

The opinion is expressed that the bill of exception, as qualified, fails to reflect reversible error; and particularly is

this true in view of the fact that the court promptly instructed the jury not to consider the remarks of the district attorney.

We have carefully examined all of appellant's contentions and fail to find reversible error.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant complains in his motion because of the failure of the original opinion herein to contain any notice relative to the trial court's failure to give in charge to the jury his requested charge No. 9. This charge embodies an effort on the part of appellant's attorney to have the trial court single out an isolated fact, and to charge the jury on the significance of such fact, thus endeavoring to obtain a charge on the weight of the evidence. See Wair v. State, No. 20241, opinion delivered May 31, 1939, and not yet reported. (Reported under cases of October 25, of this volume.) It was an effort to submit to the jury what was a reasonable time in which to make an outcry relative to what the appellant had tried to do to her at the time she received a broken arm, and whether or not at the time she made the outcry an unreasonable time had elapsed after the occurrence, and if such a time had elapsed then the appellant could not be convicted upon the uncorroborated testimony of the prosecutrix. In other words, appellant desired the court to submit to the jury the question as to what would constitute a reasonable time in which this young lady should have made an outcry and tell what her version was as to the cause of her broken arm, and what the appellant tried to do to her on the occasion in which she sustained her injury. In support of this contention we are cited to the case of Black v. State, 2 S. W. (2d) 459, and we here quote therefrom: "Complaint was made of the charge on the ground that it did not tell the jury that there could be no conviction on the uncorroborated testimony of the prosecuting witness, but such a charge is so manifestly deemed incorrect as to amount to no execption. Appellant asked one special charge, consisting of an enumeration of a number of facts and points so as to make it plainly on the weight of the evidence, and its refusal was not erroneous."

The language in the above excerpt can be used herein in disposing of this matter. It is here worthy of note that although the young lady told all inquirers on the night of the alleged offense that she fell off a bridge, it does not appear from the statement of facts when she first told of her alleged mistreatment by appellant. We are thus left uninformed of the time elapsing between such two statements, and had the court acceded to appellant's request and submitted to the jury the question of a reasonable time in which to make an outcry, we fail to see upon what testimony they could have based any finding thereon. The young lady gave her explanation of the reason for stating she had been injured in a fall from a bridge, and the jury evidently believed the same, and the requested charge, in our opinion, should not have been given.

We are again asked to review appellant's requested charge No. 10, and it is insisted that a failure to give same was error. The charge requested was relative to the prosecuting witness' testimony, and her contradictory statements as to how she had suffered the broken arm. The requested charge closes with the following statement: "You are instructed that you will consider such contradictory statements in passing upon said credibility of said witness as affecting her credibility."

We do not think this charge should have been given. It would have limited the testimony complained of to the credibility of the witness, while under the law it seems to us this testimony should have gone in unlimited, and should have applied to the whole case and not alone to the credibility of this witness. While its immediate effect was to attack her credibility, it occurs to us that it could have been used in the broader sense, and could have been utilized by the jury without any limitation. This charge was further incorrect in that it was upon the weight of the evidence. It also is subject to the construction that it instructed the jury that the witness' credibility was affected by the failure to make an immediate outcry. We do not think any error was committed in refusing the requested instruction.

There is also complaint made of the court's refusal to give special requested instruction No. 11, which was to the effect that if the prosecutrix failed to make an outcry "for some future time," then in effect the testimony of the prosecutrix required corroboration. We are unable to tell what the facts are relative to what was "some future time." We do not know from the record when she first made complaint relative to her treatment by the appellant. We only know that immediately after having suffered a broken arm she told her relatives

and friends that she fell and broke such arm. How long it was before she changed her story we do not know, and can not find out from the record. We therefore think that this charge is not shown to be applicable under the facts, and we think no error is shown in its refusal.

We think this case properly disposed of in our original opinion, and the motion will be overruled.